Court File No. CV-14-495750

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

B E T W E E N :

TD BANK, N.A.

Plaintiff

and

"LLOYD'S UNDERWRITERS" THAT SUBSCRIBE TO POLICY NUMBER
MMF/1710, PRIMARY LONDON REFERENCE NUMBER B0509QA025509 AND
EXCESS LONDON REFERENCE NUMBERS QA025609, QA025709, QA025809,
AND QA025909, ANTARES UNDERWRITING LIMITED FOR ITSELF AND ON
BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 1274 (AUL) FOR THE
OPERATING YEAR OF 2009, CATLIN SYNDICATE LIMITED FOR ITSELF AND
ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 2003 (SJC) FOR THE
OPERATING YEAR OF 2009, NOVAE CORPORATE UNDERWRITING LIMITED
AND/OR NOVAE SYNDICATES LIMITED FOR THEMSELVES AND ON BEHALF
OF ALL MEMBERS OF LLOYD'S SYNDICATE 2007 (NVA) FOR THE OPERATING
YEAR OF 2009, ACE CAPITAL LIMITED, ACE CAPITAL IV LIMITED, AND ACE
CAPITAL V LIMITED FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS
OF LLOYD'S SYNDICATE 2488 (AGM) FOR THE OPERATING YEAR OF 2009,
BRIT UW LIMITED FOR ITSELF AND ON BEHALF OF ALL MEMBERS OF
LLOYD'S SYNDICATE 2987 (BRIT) FOR THE OPERATING YEAR OF 2009,
CHAUCER CORPORATE CAPITAL (NO. 3) LIMITED (FORMERLY KNOWN AS
PEMBROKE 4000 LIMITED) AND/OR PEMBROKE 4000 LIMITED, CHAUCER
CORPORATE CAPITAL (NO. 2) LIMITED, AND/OR IRONSHORE CORPORATE
CAPITAL LTD. FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS OF
LLOYD'S SYNDICATE 4000 (PEM) FOR THE OPERATING YEAR OF 2009, ASPEN
INSURANCE UK LIMITED, GREAT LAKES REINSURANCE (UK) PLC,
LEXINGTON INSURANCE COMPANY, AIG INSURANCE COMPANY OF
CANADA (FORMERLY KNOWN AS AIG COMMERCIAL INSURANCE COMPANY
OF CANADA) AND/OR AIG COMMERCIAL INSURANCE COMPANY OF
CANADA, CHARTIS EXCESS LIMITED (FORMERLY KNOWN AS AIG EXCESS
LIABILITY INSURANCE INTERNATIONAL LIMITED) AND/OR AIG EXCESS
LIABILITY INSURANCE INTERNATIONAL LIMITED, ALLIED WORLD
ASSURANCE COMPANY LTD., ARCH INSURANCE COMPANY AND/OR ARCH
INSURANCE CANADA LTD., AXIS SPECIALTY INSURANCE COMPANY
AND/OR AXIS SPECIALTY LIMITED, CHUBB INSURANCE COMPANY OF
CANADA, ENDURANCE SPECIALTY INSURANCE LTD., HOUSTON CASUALTY
COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, MARKEL BERMUDA
LIMITED (FORMERLY KNOWN AS MAX BERMUDA LTD.) AND/OR MAX
BERMUDA LTD. and XL INSURANCE COMPANY PLC (FORMERLY KNOWN AS
XL INSURANCE COMPANY LIMITED) AND/OR XL INSURANCE LIMITED

Defendants

**FACTUM OF THE MOVING PARTIES**
**(Motion for a Production Order**
**Returnable June 7, 2016)**

March 31, 2016

**RICKETTS HARRIS LLP**
181 University Avenue
Suite 800
Toronto ON  M5H 2X7

Gary H. Luftspring (19972M)
gluftspring@rickettsharris.com
Sam R. Sasso (54124S)
ssasso@rickettsharris.com

Tel:    416.364.6211
Fax:    416.364.1697

Lawyers for the Defendants, Underwriters and
Axis

**HALFNIGHT & McKINLAY**
**PROFESSIONAL CORPORATION**
Barristers and Solicitors
65 Front Street East
Suite 201
Toronto ON  M5E 1B5

Jamieson Halfnight
jhalfnight@halfnightlaw.com
Anne Juntunen
ajuntunen@halfnightlaw.com

Tel:    416.361.3082
Fax:    416.361.0230

Lawyers for the Defendants,
Chubb Insurance Company of Canada and
Liberty Mutual Insurance Company

# TABLE OF CONTENTS

Page No.

PART I - INTRODUCTION AND OVERVIEW ................................................................. 1

PART II - SUMMARY OF FACTS ................................................................................... 4

    (i)     The Rothstein Scheme ................................................................................. 4
    (ii)    The Underlying Actions ............................................................................... 5
    (iii)   The Coquina Verdict and Judgment ........................................................... 6
    (iv)   The Investor Settlements .............................................................................. 6
    (v)    The Regulatory Actions ............................................................................... 7
    (vi)   TD's Claim.................................................................................................... 7
    (vii)  The Insurers' Defences ................................................................................ 8
    (viii) Issues in the Action ..................................................................................... 8
    (ix)   The Discovery Process to Date .................................................................... 9
    (x)    TD's Expert Reports .................................................................................. 10

PART III - STATEMENT OF ISSUES, LAW & AUTHORITIES ............................... 11

    (i)     The Issue to be Determined ....................................................................... 11
    (ii)    TD is Obligated to Produce the Disputed Documents ............................... 11
    (iii)   The Onus Lies with TD to Remove Any Negative Foreign Consequences ......... 12
    (iv)   TD Must Produce The Marked Discovery Documents ............................... 17
    (A)   The Marked Discovery Documents are Relevant ...................................... 19
    (B)   TD Has Possession or Control of the Marked Discovery Documents.................. 20
    (C)   The Marked Discovery Documents are Not Privileged ............................. 20
    (D)   The U.S. Protective Orders Have No Effect on TD's Ontario Production
           Obligations ................................................................................................ 20
    (v)    TD Must Produce the Unredacted Banking Documents ............................ 22
    (vi)   TD Must Produce the Regulatory Investigation Documents ..................... 26
    (vii)  Conclusion ................................................................................................. 29

PART IV - ORDER REQUESTED .................................................................................. 30

## FACTUM OF THE MOVING PARTIES
### (Motion for a Production Order
### Returnable June 7, 2016)

## PART I - INTRODUCTION AND OVERVIEW

1.     The primary issue on this motion is whether TD must produce the Disputed Documents (as defined below).  It is the Insurers' position that under Ontario law TD is obligated to produce the Disputed Documents or, at the very least, take reasonable steps to do so.

2.     The Insurers provided TD Bank, N.A. ("TD") with CAD$300 million in coverage under a financial institution bond and professional liability policy pursuant to an Integrated Risk Programme of layered policies (collectively, the "Policies"), subject to an applicable retention of CAD$100 million. TD claims that the Insurers are obligated to pay the entire $300 million in policy proceeds, and other amounts, arising from losses TD says it incurred as a result of a Ponzi scheme run by Florida lawyer Scott Rothstein.

3.     In January 2014, TD brought this action against the Insurers for over $300 million (the "Action").  The pleadings were closed as of the end of May, 2015.

4.     Since TD commenced the Action, the parties have met with each other on a number of occasions. They have also participated in four case conferences with Justice Dunphy who is case-managing the Action.

5.     TD has not produced, even in draft form, an affidavit of documents. TD has, however, communicated its position that it will not produce any documents in the following four categories:

        (a)     mediation and settlement documents,

(b)     documents marked "confidential" pursuant to U.S. protective orders (the "**Marked Discovery Documents**"),

(c)     complete banking documents showing the movement of funds through Rothstein's accounts (the "**Unredacted Banking Documents**"), and

(d)     documents provided to, and received from, U.S. regulators in connection with the Rothstein scheme (the "**Regulatory Investigation Documents**").

6.      In this motion, dubbed "Production Motion 1", the Insurers seek an order that TD is required to produce the documents in categories (b), (c) and (d), all of which are referred to as the "**Disputed Documents**" for purposes of this motion. The Insurers' motion on TD's refusal to produce documents in category (a) will be heard at a later date.

7.      The Ontario Rules [Rule 30.02(1)] provide that a party must produce "*every document relevant to any matter in issue in an action*" in its possession, control or power, subject only to one exception: privilege.

8.      As is explained in more detail later in this factum, the Disputed Documents are relevant to the claims and defences in the Action and TD has never expressed any objection on the basis of relevance. Nor has TD identified any applicable privilege that would justify withholding these documents. Given this, the key requirements for production have been met.

9.      The explanation the Insurers have received from TD as to why the documents have not been produced is that producing them would put TD in violation of U.S. protective orders or privacy laws. The Insurers understand TD's position to be that if the bank produces the Disputed Documents without first obtaining permission to do so from U.S. courts and/or regulators, it may risk negative legal consequences in the U.S.  Further, TD says that it does not have the obligation to obtain the permission it says it needs.

10.     Instead, TD appears to be seeking to shift the burden of production to the Insurers. TD has taken the position that if the Insurers want the Disputed Documents they should retain U.S. counsel to, as may be necessary for certain documents, bring motions in the U.S. to get permission for TD to make production of the Disputed Documents.

11.     Such burden-shifting in document production is inconsistent with both the letter and the spirit of the Ontario Rules. There is no compelling evidence or argument to support shifting the onus of production to an opposing party in litigation. There are simply no principled grounds upon which to require the defendants in an Ontario lawsuit to take steps to obtain relevant documents in the possession, control or power of the plaintiff. Ontario's discovery framework is, in fact, designed to avoid such a situation.

12.     In addition, given that TD has not produced, even in draft form, an affidavit of documents, the Insurers are in no position to articulate which specific documents they are asking for, even if they were to seek permission from U.S. courts or regulators.

13.     It is against this backdrop that the Insurers take the position that TD is responsible for taking whatever steps are necessary to produce the Disputed Documents. The Insurers' position is supported by ample case law. In fact, as set out more fully below, the case law supports putting TD to an election: TD must either take reasonable steps to produce the Disputed Documents or have its claim significantly compromised or dismissed.

14.     As a result, the Insurers respectfully request that this Court grant an Order requiring TD to produce the Disputed Documents. If TD would like additional time to bring proceedings in the U.S. to eliminate the risk of negative legal consequences, the reasonableness of the time allowed can be established accordingly.

## PART II - SUMMARY OF FACTS

15.     A comprehensive recitation of the facts with respect to this Action is neither required nor likely welcome for the purposes of this motion. Instead, the summary of facts below will address only those issues relevant to this motion. Unless otherwise indicated, the facts are based on the allegations in the various pleadings, which is appropriate given that the pleadings define the scope of TD's production obligations.

### (i)      *The Rothstein Scheme*

16.     The genesis of the present Action is TD's claim under the Policies for losses allegedly suffered following a $1.2 billion Ponzi scheme orchestrated by Scott Rothstein ("Rothstein" and the "Rothstein Scheme"). In the pleadings, TD alleges that:

(a)     Between 2007 and 2009, Rothstein opened a number of accounts at Commerce Bank (the "RRA Accounts"), which became TD Bank after TD acquired Commerce.  Rothstein used the RRA Accounts to facilitate the Rothstein Scheme, which he operated through his law firm, Rothstein Rosenfeldt Adler P.C. ("RRA").

(b)     The Rothstein Scheme involved the sale of interests supposedly held by RRA's clients in confidential structured settlements allegedly received as settlement of sexual harassment and whistleblower claims. RRA's clients purportedly assigned their interests in the settlement proceeds, which were to be paid over time, to the third party purchasers of the settlements (the "Investors") in exchange for a discounted lump sum payment.

(c)     Each Investor made up-front cash payments to Rothstein that Rothstein said he would immediately transfer to RRA's client as a discounted lump sum. In exchange, the Investor received the right to collect the full amount of the settlement at a later date or dates, or over time. Rothstein chose to receive the Investors' funds in RRA's main operating accounts but instead of transferring them to victims, he used them to repay earlier Investors or fund his own lavish lifestyle.

(d)     Rothstein represented to the Investors that the settlement funds had been paid by corporate defendants and were safely deposited into one of the RRA Accounts. In

order to reassure some of the Investors that the settlement funds from the settlement they had purchased had been deposited and were simply waiting to be paid out on schedule, Rothstein established separate accounts at TD (the "Settlement Accounts"), which Rothstein represented held the settlement proceeds. Rothstein told some Investors that these Settlement Accounts were "locked" such that the monies in them could not be distributed except to the specified Investor for whom the funds were being held. In reality, the Settlement Accounts almost always held less than $100.

(e)    There were no clients, no settlements and obviously, no settlement funds. Rothstein used the Investors' money for his own purposes, and the funds the Investors believed they would receive – the defendant's settlement payment – never existed.

(f)    Like most Ponzi schemes, the Rothstein Scheme continued for as long as Rothstein could dupe new Investors. The scheme was exposed in October 2009, when Rothstein began to default on Investor payments. RRA entered bankruptcy and Rothstein pleaded guilty to criminal charges. Rothstein is currently serving 50 years in prison.

### (ii)    The Underlying Actions

17.    Following Rothstein's arrest and RRA's entry into bankruptcy, the Investors filed 18 lawsuits in Florida state and federal courts against Rothstein, TD and other participants in the Rothstein Scheme (the "Investor Lawsuits"). RRA's bankruptcy trustee also filed an adversary action against the bank (the "RRA Lawsuit") (collectively, the "Investor Lawsuits" and "RRA Lawsuit" to be referred to as the "Underlying Actions"). TD reported these Underlying Actions to the Insurers.

**Reference**    Manevich Affidavit, at paras. 7, 12; Insurers' Motion
Record at pages 25, 26.

18.    A review of the pleadings in the Underlying Actions reveals that the Investors were making the same or substantially similar allegations that TD and its officers and employees had facilitated the Rothstein Scheme. The Investors alleged that TD conspired with Rothstein to reassure them

that the structured settlement transactions were legitimate and to provide the Investors with a false sense of security.

> **Reference**      Manevich Affidavit, at para. 8; Insurers' Motion Record at page 26.

### (iii)    *The Coquina Verdict and Judgment*

19.     According to TD, the only Underlying Action to proceed to a final judgment was an action brought by an Investor named Coquina Investments (the "Coquina Action"). On January 18, 2012, a jury returned a verdict against TD in the Coquina Action. The U.S. District Court found TD liable in the amount of $67 million for fraudulent misrepresentation and aiding and abetting fraud. Of the total award, $32 million constituted compensatory damages and $35 million was in respect of punitive damages.

> **Reference**      Manevich Affidavit, at para. 9; Insurers' Motion Record at page 26.

20.     TD filed a number of post-trial motions and brought an appeal, seeking to overturn or modify the judgment, but the verdict was upheld.

> **Reference**      Manevich Affidavit, at para. 10; Insurers' Motion Record at page 26.

### (iv)    *The Investor Settlements*

21.     Following the verdict in the Coquina Action, TD reported that it settled the outstanding Underlying Actions. TD has reportedly paid approximately CAD $487 million with respect to the Investor Lawsuits and RRA Lawsuit, as well as approximately CAD $49 million in defence costs.

| Reference | Manevich Affidavit, at para. 11; Insurers' Motion Record at page 26. |

22.     The Insurers were not consulted regarding these settlements. However, the amounts appear to the Insurers to be quite high, given the amounts claimed by the Investors.

*(v)*     ***The Regulatory Actions***

23.     In addition to the Underlying Actions, TD came under scrutiny by U.S. federal regulators for its role in the Rothstein Scheme. These regulators included the Securities and Exchange Commission, the Office of the Comptroller of the Currency ("OCC"), and the Financial Crimes Enforcement Network ("FinCEN").

| Reference | Manevich Affidavit, at para. 15; Insurers' Motion Record at page 32. |

24.     According to public documents, the regulatory investigations concluded with TD paying USD$52.5 million in penalties for its role in the Rothstein Scheme. Of this amount, USD$37.5 million went to FinCEN and the OCC; the remaining portion went to the SEC.

| Reference | Manevich Affidavit, at para. 15; Insurers' Motion Record at page 32. |
| | SEC and OCC Orders and FinCEN Assessment at Exhibits 8A, 8B and 8C of Manevich Affidavit; Insurers' Motion Record at pages 295, 304, 316. |

*(vi)*     ***TD's Claim***

25.     With its Statement of Claim, later amended (the "Claim"), TD is seeking to have the Insurers pay the aggregate policy limits of $300 million, plus interest, to cover its payments for settlements, judgments and defence costs incurred in defending the Underlying Actions.

**Reference**      Manevich Affidavit, at paras. 5 and 6; Insurers' Motion
               Record, Tab 2, p. 25.

*(vii)*    ***The Insurers' Defences***

26.     The Insurers have defended the Claim on the basis that, among other things, TD has failed
to meet the requirements of the Policies' insuring agreements and several coverage exclusions
have been triggered.

*(viii)*    ***Issues in the Action***

27.     There are a number of issues in the Action, including:

(1)     The extent of TD's role in the Rothstein Scheme;

(2)     Whether any of the Underlying Actions were brought about by any dishonest,
        fraudulent or criminal act or omission by a TD director, officer or employee;

(3)     Whether any TD director, officer or employee intended to or did benefit from the
        Rothstein Scheme;

(4)     Whether TD violated money laundering laws in connection with the Rothstein
        Scheme;

(5)     Whether any TD director, officer or employee knew, suspected or reasonably
        should have known or suspected that Rothstein or RRA would benefit from their
        activities;

(6)     The timing and flow of funds in the Rothstein Scheme;

(7)     How and when the Investors suffered a loss as a result of the Rothstein Scheme;

(8)     The amount of each Investor's loss;

(9)     Whether and when TD suffered a loss (as covered under the Policies) relating to the
        Rothstein Scheme and, if so, whether that loss was "direct" within the meaning of
        the Policies;

(10)    The timing and flow of funds within TD and from Investors to the RRA accounts at
        TD;

(11)    Why TD settled the remaining Investor Lawsuits and the RRA Lawsuit, including in part because of fear of reputational damage;

(12)    Whether TD's settlements were reasonable under the circumstances;

(13)    For each of the settlements, how TD did (and how the Court should) allocate payments as between general damages (which are potentially covered by the Policies) and punitive damages (which are not covered by the Policies);

(14)    What relationship TD had to the funds in the RRA Accounts;

(15)    Whether TD's settlement payments were reflective of the amount lost by each Investor; and

(16)    Why TD paid fines as a result of the regulatory investigations.

### *(ix)*    *The Discovery Process to Date*

28.    The process of document production began cooperatively. Counsel on both sides met several times over many months to work out any issues. It appeared progress was being made, so much so that scheduled motion dates were converted to case conferences.

29.    But two days before what had been an October 2015 motion date, TD advised that the discussions were over. TD advised that it refused to produce the Disputed Documents, citing the risk of negative consequences under U.S. law if it did not first obtain permission from regulators and courts. At the same time, TD advised that it refused to take any steps to obtain such permission and suggested that the Insurers should take any necessary steps if they wanted the documents.

> **Reference**    Manevich Affidavit, at paras. 17, 18; Insurers' Motion Record, Tab 2, p. 33.

30.    Although the Action has been proceeding for some time, discovery is only beginning. TD has not produced, even in draft form, an affidavit of documents, a list of relevant documents it has in its possession, or a Discovery Plan.

31.    TD has, however, made it clear that it will not produce the Disputed Documents.

*(x)    TD's Expert Reports*

32.    In response to the present motion, TD has introduced two expert affidavits by Florida lawyer Patricia M. Hernandez ("Hernandez") dated November 25, 2015 ("Hernandez's Original Report") and February 29, 2016 ("Hernandez's Responding Report") (collectively, the "Hernandez Reports"). These affidavits appear to be aimed at showing that U.S. law prohibits banks from producing the Unredacted Banking Documents and the Regulatory Investigation Documents, as well as attempting to convince the Court that the Insurers, not TD, should have the obligation to seek permission from U.S. courts and regulators to allow TD to meet its discovery obligations.

33.    The cross-examination of Ms. Hernandez, coupled with the expert report of U.S. regulatory compliance expert Gary Peterson ("Peterson"), which was submitted by the Insurers, revealed that the U.S. law restrictions are, in fact, more circumscribed than Ms. Hernandez initially suggested – as will be explained below. But neither Ms. Hernandez nor Mr. Peterson is of any assistance to this Court in determining who bears the burden to request the documents in question. That is a matter of Ontario law, on which neither expert is qualified to opine.

|  |  |
|---|---|
| **Reference** | Transcript of Hernandez Cross-Examination dated March 2, 2016 at pp. 22-23, questions 78-81 (acknowledging that Ms. Hernandez has no knowledge of Ontario law with respect to the Ontario discovery process or how it contrasts with US Federal or Florida laws). |

## PART III - STATEMENT OF ISSUES, LAW & AUTHORITIES

### *(i)     The Issue to be Determined*

34.     The Insurers submit that the primary issue on the present motion is whether TD must produce the Disputed Documents.

35.     In fact, TD appears not to contest this, but complains that its Ontario discovery obligations may have negative legal ramifications for its U.S. operations. TD appears to want to argue over a secondary issue: which party has the onus to take steps to remove the negative legal consequences in the U.S. that TD is worried about. TD takes the position that the Insurers should bear the burden of seeking to remove any risk of negative legal consequences in another jurisdiction occasioned by complying with its discovery obligations in Canada. For the reasons described more fully below, the Insurers submit that TD's position is unsupportable.

36.     The onus of meeting its discovery obligations lies with TD and TD cannot shift that onus to the Insurers.

### *(ii)     TD is Obligated to Produce the Disputed Documents*

37.     The analysis begins with Rule 30.02, which places the onus to disclose and produce relevant documents squarely on each party's own shoulders:

> 30.02(1) Disclosure – **Every document relevant to any matter in issue in an action** that is or has been in the possession, control, or power of a party to the action **shall be disclosed** as provided in rules 30.03 to 30.10, whether or not privilege is claimed in respect of the document.
>
> 30.02(2) Production for inspection – Every document relevant to any matter in issue in an action that is in the possession, control or power of a party to the action shall be produced for inspection if

> requested, as provided in rules 30.03 to 30.10, unless privilege is claimed in respect of the document.

**Reference**    Rules of Civil Procedure, RRO 1990, O.Reg 194, Rules 30.02(1) and 30.02(2) (emphasis added).

38.    For the reasons explained further below, the Disputed Documents are relevant and in TD's possession, control or power. Consequently, there should be no question that at the very least the Disputed Documents need to be disclosed pursuant to 30.02(1).

39.    Notwithstanding its obligation to do so, TD has not produced, even in draft form, an affidavit of documents which would identify the Disputed Documents. As a result, the Insurers do not even know the specific Disputed Documents they are seeking with this motion, other than in a general way.

40.    TD has not identified any privilege recognized in Ontario which would apply to the Disputed Documents. As a result, the key requirements for production have been met and the documents should be produced.

*(iii)*    ***The Onus Lies with TD to Remove Any Negative Foreign Consequences***

41.    TD appears to take the position that although the Disputed Documents are producible, the bank has no obligation to actually produce them. Rather, TD seems to say that the Insurers should retain U.S. counsel to commence proceedings in the U.S. in order to obtain permission for TD to produce the documents. There is no legal justification for requiring the Insurers to go to these lengths.

42.    This is not the first time someone in a Canadian action has cited foreign law as a reason why it cannot produce relevant information and documents. Positions similar to TD's have been

13

taken in a handful of prior cases including *Frischke v. Royal Bank*, *R. v. Spencer*, *Comexter v. Cassady*, *Ed Miller v. Caterpillar* and *Comaplex v. Schaffhauser*. A review of these cases reveals that courts do not permit litigants to shield themselves from their Canadian production obligations on the basis that a foreign law may be violated by doing so.

|  |  |
|---|---|
| **Reference** | *Frischke v. Royal Bank of Canada*, [1977] 17 O.R. (2d) 388 [*Frischke*] [Insurers' Book of Authorities at Tab 1]. |
|  | *R. v. Spencer*, [1985] 2 S.C.R. 278 [*Spencer*] [Insurers' Book of Authorities at Tab 2]. |
|  | *Comexter Inc. v. Cassady* [1987] B.C.J. No. 2625 [*Comexter I*], aff'd in *Comexter v. Cassady*, [1987] B.C.J. No. 1558 [*Comexter II*] [Insurers' Book of Authorities at Tabs 3 and 4]. |
|  | *Ed Miller Sales & Rentals Ltd. v. Caterpillar Tractor Co.*, [1988] 61 Alta. L.R. (2d) 319 [*Ed Miller I*], aff'd in *Ed Miller Sales and Rentals v. Caterpillar Tractor Co.* (1988), 61 Alta. L.R. (2d) 319 (C.A.) [*Ed Miller II*] [Insurers' Book of Authorities at Tabs 5 and 6]. |
|  | *Comaplex Resources International Ltd. v. Schaffhauser Kantonalbank* [1990], 42 C.P.C. (2d) 230 (Ontario S.C.J. (Master)) [*Comaplex I*], *Comaplex Resources International Ltd. v. Schaffhauser Kantonalbank*, [1991] O.J. No. 1643 [*Comaplex II*] [Insurers' Book of Authorities, at Tabs 7 and 8]. |

43.     The Supreme Court of Canada's decision in the 1985 case of *Spencer* is particularly instructive. In that case, a Canadian citizen and resident refused to testify in a tax proceeding on the basis that doing so would violate Bahamian banking laws. The individual was not a party to the proceeding, but he had acquired knowledge of the defendant's customers and banking transactions in the course of his work as a manager at the Royal Bank's Freeport, Bahamas branch. The former bank manager presented evidence that Bahamian law imposed severe consequences for disclosing

banking information of customers, including a fine up to $15,000 or imprisonment of up to two years.

> **Reference**        *Spencer* at para 1.

44.    Writing for the majority, with the Court unanimous in the outcome, Justice La Forest explained that regardless of whether disclosing the evidence would amount to a crime in the Bahamas, "*the public and the courts have a right to [the bank manager's] evidence*". If the bank manager were permitted to withhold evidence on the basis that disclosure would violate foreign laws, a foreign country would be permitted to frustrate the administration of Canadian justice. The Court noted that the defendant in the action was a Canadian citizen and the proceeding was a domestic matter.

> **Reference**        *Spencer* at paras 2, 5.

45.    In his concurring decision in *Spencer*, Justice Estey offered a solution for addressing friction between Canadian discovery obligations and foreign secrecy laws. That path has since been cited with approval by other courts. He suggested that the lower court should grant a stay long enough to allow the witness to apply to a Bahamian court for an order permitting disclosure of the evidence. But Justice Estey also noted that if the foreign court refused to issue that order within a reasonable time, the evidence would need to be produced.

> **Reference**        *Ed Miller II* at para 33; *Comaplex II* at paras 58-60; *Spencer*
> at paras 9, 10.

46.    When compliance with Ontario discovery obligations creates potential non-compliance with foreign law, the onus rests on the party alleging foreign law prohibitions to attempt to resolve them, as Master Sandler found in *Comaplex I*:

15

> A discovery order for production of documents and disclosure of information by a party to a civil action can have a salutary effect and provide the party involved with both the incentive and the authority to take steps to comply with such an order. If compliance is not truly possible, the party can put all the information on that issue before the court on a motion to consider sanctions for disobeying the order. The party can put forward reasonable alternative if full compliance cannot be made. The party alleging any foreign law prohibitions or restrictions is in the best position to take steps, within its own jurisdiction, for the relaxation of any laws preventing it from giving the information ordered. Foreign states may be somewhat more flexible in the application of their laws where necessity or duress involving a discovery order for production is involved.

**Reference**     *Comaplex I* at para 12.

47.     Master Sandler added that on a sanctions motion, the party alleging a foreign law restriction "could put forward the efforts it has made to provide the discovery ordered, including the attempts it has made to secure waivers, consents or exemptions."

**Reference**     *Comaplex I* at para 12.

48.     Similarly, in *Ed Miller*, the Alberta Court of Appeal found that the party with the obligation to produce has an obligation to try and remove any foreign legal constraints.

**Reference**     *Ed Miller I* at para 13.

49.     In *Comexter*, Taggart J.A. of the British Columbia Court of Appeal, found that foreign production laws could not be used as the basis for refusing document production:

> Clearly, in this case, there are issues between Comexter, which of course is the only plaintiff which can claim the protection of Swiss law, and the defendants. There is indeed a real lis between them. In these circumstances, I think it is clear from the authorities to which I have referred that Comexter cannot call in aid the penal sanctions of Swiss law to support a refusal to produce documents.

16

Reference    *Comexter II* at para 26.

50.    In a situation analogous to the present case, in *McAvan Holdings v. BDO Dunwoody Ltd.*,

Master Albert required the plaintiff to seek production of relevant documents from the Canada

Customs and Revenue Agency ("CCRA"). In fact, Master Albert put the plaintiff to an election:

> [31] I find that the court cannot compel CCRA to produce the documents without McAvan's consent. I also find that the court cannot compel McAvan to consent against his will. However, I find that the documents in issue are relevant at the production stage of the action and that they are within McAvan's control and power. McAvan has an obligation to produce them. Failure to do so would constitute a breach of McAvan's disclosure obligations under rule 30.02. In those circumstances, in the absence of production by McAvan of the CCRA documents, the appropriate sanction would be to stay the action pursuant to s. 106 of the Courts of Justice Act, R.S.O. 1990, c. C.43 or, if circumstances warrant, dismiss the plaintiff's claim pursuant to rule 30.08.
>
> [32] For these reasons, I find that the documents in the files of CCRA are within the power and control of McAvan and must be produced by McAvan pursuant to rule 30.02....
>
> [40] For the reasons given, THIS COURT ORDERS:
>
> 1. The plaintiffs shall take all necessary steps to obtain their files from Canada Customs and Revenue Agency and within ten days of receiving the files the plaintiffs shall prepare a further and better affidavit of documents listing the documents and producing all documents listed in schedule "A". Alternatively, the plaintiffs may choose to discontinue the action.
>
> 2. If the plaintiffs fail to comply with the order to produce the CCRA documents, then upon motion with affidavit evidence supporting a finding that insufficient steps were taken by the plaintiffs to comply with this order, I would be prepared to stay the action under s. 106 of the Courts of Justice Act or dismiss the claim, depending upon the circumstances of the default.

Reference    *McAvan Holdings v. BDO Dunwoody Ltd.* (2003), 65 O.R. (3d) 247, at paras 7-32, 40 (Ont. S.C.J. (Master)) [*McAvan*] [Insurers' Book of Authorities at Tab 9].

17

51.    As recently as 2011, parties to Canadian litigation have been ordered to produce documents despite the fact that the documents were protected from production under the local U.S. laws in which the proceedings were being litigated.

> **Reference**    *IPEX Inc. v. AT Plastics Inc.*, 2011 ONSC 4734 (Ont. S.C.J.)
> [*IPEX*] [Insurers' Book of Authorities at Tab 10].

52.    In sum, under the law of Canada, foreign legal consequences do not excuse litigants from their obligation to produce relevant documents.

### (iv)    *TD Must Produce The Marked Discovery Documents*

53.    The **Marked Discovery Documents** consist of documents produced by opposing parties and marked "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" pursuant to stipulated protective orders issued in the Underlying Actions. Although TD has not clearly articulated its position in this regard, the bank would appear to be relying on protective orders issued in 7 of the 19 Underlying Actions. Copies are attached to the affidavit of Alejandro Manevich as indicated:

1.    *Adams, et al. v. TD Bank, et al.*, at Tab 1B,

2.    *Beverly, et al. v. TD Bank, et al.*, at Tab 2A,

3.    *Coquina Investments v. TD Bank, et al.*, at Tab 3A,

4.    *Emess Capital, LLC v. TD Bank, et al.*, at Tab 4A,

5.    *Morse, et al. v. TD Bank, et al.*, at Tab 5,

6.    *Razorback Funding, LLC, et al. v. TD Bank, et al.*, at Tab 6, and

7.    *Stettin v. TD Bank* (the "RRA Bankruptcy"), at Tab 7P.

54.    While each protective order is different, all were entered at the request of TD and the opposing party, both of whom agreed on a protocol for producing documents and asked the

presiding judge to enter their agreement as an order. This is a common practice in U.S. litigation, where there is no deemed undertaking rule, and the effect of the orders is similar to the deemed undertaking rule in Canada.

55.     The protective orders generally provide that the parties may produce documents in the course of discovery and may self-designate those documents as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY". Documents designated "CONFIDENTIAL" are to be shared only among the parties, their counsel, expert witnesses, and the court. Documents designated "ATTORNEYS' EYES ONLY" may be viewed only by the parties' counsel and the court.

56.     The protective orders generally provide that, after the litigation has concluded, the parties will destroy or return the Marked Discovery Documents to each other. Some orders allow the parties to retain copies, however.

57.     Notably, all of the orders contain built-in procedures for modification. The court remains seized of the matter for purposes of altering the protective order, even after the action is concluded, and TD continues to have standing to seek to vary the order.

|  |  |
|---|---|
| **Reference** | *See, e.g.,* paragraph 19 of the protective order in *Coquina Investments* at Tab 3A to the Manevich Affidavit, Insurers' Motion Record, p. 73.<br>*See, e.g.,* paragraph 19 of the protective order in *Emess Capital* at Tab 4A to the Manevich Affidavit, Insurers' Motion Record, p. 130.<br>*See, e.g.,* paragraph 14 of the protective order in *Morse* at Tab 5A to the Manevich Affidavit, Insurers' Motion Record, p. 73, 147. |

58.     Some of the orders provide that if a party wishes to use a Marked Discovery Document for a purpose not permitted under the order, that party may simply notify the original producer. If the

original producer does not object within a certain number of days, the Marked Discovery Document may be used.

59.     The protective orders provide that a party's designation of a Marked Discovery Document is not binding on any other court with respect to whether that document is confidential, discoverable or admissible.

60.     TD has led no evidence on the present motion with respect to the Marked Discovery Documents.  The Insurers submit that there is no reason why TD, as a party to the protective orders and the actions which gave rise to the Marked Discovery Documents, should not be required to produce the documents and, if appropriate, seek to have those orders modified.

### (A)     *The Marked Discovery Documents are Relevant*

61.     While TD has not disclosed the number or contents of the Marked Discovery Documents, these documents are unquestionably relevant to the issues in the Action. They are the documents the Investors produced to TD to prove that Rothstein had defrauded them using the RRA Accounts. They include the evidence provided by the Investors to establish the quantum of their losses, including amounts paid to, and received from, Rothstein. They must certainly include correspondence between the Investors, TD, and Rothstein.

62.     This evidence bears on issues central to the coverage issues and the Insurers' defence, including:

    (a)     whether any TD employees acted dishonestly,

    (b)     if so, whether that dishonesty caused a loss to TD,

    (c)     what amounts were lost,

(d)      what relationship TD had to the lost funds, and

(e)      whether TD's settlement payments were reasonable.

*(B)*      <u>*TD Has Possession or Control of the Marked Discovery Documents*</u>

63.     TD has not revealed exactly where the Marked Documents are located, or whether they are in paper or electronic format. But to the extent the documents were produced to TD in the Underlying Actions, TD possesses or controls them.

*(C)*      <u>*The Marked Discovery Documents are Not Privileged*</u>

64.     To date, TD has not identified any existing privilege applicable to the Marked Discovery Documents – nor can it, as there is no recognized privilege for documents produced by opposing parties in prior litigation. Even if the documents are sensitive or confidential, this does not make them privileged.

> **Reference**    *Transamerica Life Ins. Co. v. Canada Life Assurance Co.*, 27 O.R. (3d) 291, 46 C.P.C. (3d) 110, at para 25 [*Transamerica*] [Insurers' Book of Authorities at Tab 11] (holding that a statutory promise of confidentiality does not necessarily constitute a bar to compelling production of documents).

*(D)*      <u>*The U.S. Protective Orders Have No Effect on TD's Ontario Production Obligations*</u>

65.     The Ontario Rules are clear that relevant, non-privileged documents must be produced. If the resisting party cannot establish an applicable privilege recognized in Canada, the inquiry ends.

66.     But TD has refused to produce the Marked Discovery Documents on the basis of the U.S. protective orders having:

(a)    participated in the protective orders' creation,

(b)    received and used the Marked Discovery Documents to defend itself in the Underlying Actions,

(c)    settled the Underlying Actions based on its assessment of the merits after reviewing the Marked Discovery Documents, and

(d)    issued a coverage action in Ontario to force the Insurers to pay for its settlements.

67.    TD now claims that it should not be required to provide the Insurers with the Marked Discovery Documents. This is improper.

68.    In *Ed Miller Sales*, the Alberta Court of Appeal considered a party's refusal to produce evidence on the basis of a protective order issued by a U.S. court. In that case, Ed Miller (the plaintiff) asked Caterpillar (the defendant) to produce transcripts of depositions from a prior U.S. action. The depositions contained the testimony of Caterpillar employees in Caterpillar's lawsuit against another company. Caterpillar refused to produce the transcripts, citing a protective order in the U.S. action.

**Reference**    *Ed Miller II* at paras 30-32.

69.    The Alberta Court of Appeal upheld the decision of the Alberta Court of Queen's Bench requiring that the transcripts be produced. The Court of Queen's Bench had reasoned that the transcripts might "*provide useful information to assist this court in determining the true facts in the present case.*" Noting that Caterpillar had consented to the protective order in question, the Court acknowledged Caterpillar's professed discomfort with violating the U.S. order and pointed to the path offered by Justice Estey in *Spencer*, which would allow Caterpillar time to seek relief from the U.S. orders.

**Reference**    *Ed Miller II* at paras 33, 35, 37.

*Ed Miller I* at para 12.

70.      Likewise, in *Beise v. Bell Helicopter Textron*, the Court ordered a party resisting

production to take whatever steps it considers necessary to ensure compliance with any applicable

U.S. protective orders:

> In the circumstances, the obligation is on Rolls-Royce to produce the documents.  If
> Rolls-Royce is of the view that such production will breach a U.S. protection order, then
> the burden is on it to establish that fact and to take the steps, if necessary, to obtain consent
> or a court order.

| **Reference** | *Beise v. Bell Helicopter Textron*, 2014 BCSC 1240 (BC S.C.J. (Master)), at para. 23. [*Beise*] [Insurers' Book of Authorities at Tab 12]. |
| --- | --- |
| | See also *Beazley v. Suzuki Motor*, 2008 BCSC 850 (BC S.C.J.), aff'd 2009 BCCA 57 (BC C.A.) [*Beazley*] [Insurers' Book of Authorities at Tab13]. |

71.      Similarly, efforts to avoid producing relevant documents on grounds that the documents

are subject to a Canadian arbitral order prohibiting their disclosure have failed.

| **Reference** | *Adesa Corp. v. Bob Dickenson Auction Service Ltd.*, [2004] O.J. No. 4925, 73 O.R. (3d) 787, at paras. 53, 56 [*Adesa*] [Insurers' Book of Authorities at Tab 14] (ordering production of documents from an arbitration despite that the arbitrator had ordered the documents to be kept confidential, on the basis that the confidentiality of arbitration is not "*so important as to outweigh the need in this court for justice if that requires the disclosure*"). |
| --- | --- |

72.      The Insurers ask this Court to exercise its own inherent jurisdiction to determine the issues

between the parties by ensuring that all relevant documents are before it.

*(v)*      **TD Must Produce the Unredacted Banking Documents**

73.      The **Unredacted Banking Documents** include the complete banking documents reflecting

the movement of funds into, through, and out of the RRA Accounts.

74.     The Unredacted Banking Documents are relevant to the claims and defences in the Action because they show:

(a)     how and when funds moved through the RRA Accounts,

(b)     what the investors lost and when they lost those funds, and

(c)     whether any Investors received surpluses through the settlements they received.

That is, the movement of funds shows the relationship between monies lost by Investors and the settlement funds paid by TD – a key issue in the Action.

75.     The Unredacted Banking Documents also reveal the nature of the accounts through which funds moved. TD has taken the position that it is entitled to coverage, in part, because some of the funds were in accounts that were labeled as, or functioned as, trust accounts. The Unredacted Banking Documents would reveal information about:

(a)     which of the funds moved through trust accounts,

(b)     whether funds came from an Investor who also claimed to have relied on assertions of a TD representative in that regard,

(c)     what monies passed through accounts for which there was a "lock letter", as opposed to accounts for which there was no lock letter, and

(d)     if there was a "lock letter" for an account, whether the lock letter was signed by a TD employee or forged.

76.     TD has not identified any privilege recognized in Canada that would allow it to avoid producing the Unredacted Banking Documents. TD has refused to produce the documents, however, apparently because doing so would reveal the names and account information of Investors. The affidavit of TD's expert, Ms. Hernandez, suggests TD will take the position that

producing the documents would violate the U.S. federal Gramm-Leach-Bliley Act ("GLBA") and Florida privacy law.

> **Reference**     Hernandez Affidavit at pages 11-15 (citing the GLBA at 15 U.S.C. § 6802(e), the GLBA's implementing regulation at 12 C.F.R. 1016.3(e), and Florida privacy law at Fla. St. 655.059).

77.     For the reasons already set out above, U.S. law is irrelevant to TD's production obligations. If the documents are producible under the Ontario Rules, TD must produce them.

78.     However TD suffers from no such limitations as the testimony of TD's own expert shows that neither the GLBA nor Florida privacy law prevents TD from producing the Unredacted Banking Documents. Specifically:

> (a)     The GLBA is likely inapplicable here because it applies only to individual consumers, while and the Rothstein Scheme appears to have been targeted toward institutional investors and feeder funds.

> **Reference**     Hernandez Affidavit at page 12 (stating that 15 U.S.C. § 6802(e)(8) applies only to the disclosure of non-public personal information of a "consumer", and that the regulations promulgated under the GLBA define "consumer" as an individual who obtains a financial product for primarily personal or family use).
>
> Hernandez Cross-Examination at page 7, question 7 (acknowledging that the GLBA does not apply to business accounts).

> (b)     The GLBA also contains other carve-outs that may apply here. For example, the GLBA permits banks to produce consumer documents where the bank's customer agreements give consumers a chance to opt-out. Having had no opportunity to

conduct discovery, the Insurers have not been able to explore whether these
provisions apply.

**Reference**   Hernandez Cross-Examination at pages 37-38, questions
147-148 (explaining that the GLBA permits disclosure
where the bank advises its customer that it is prepared to
produce information to third parties, and saying that she has
no knowledge of whether TD in fact included such
statements in its annual privacy statement).

(c)   Even if the GLBA does apply, it permits TD to produce Unredacted Banking
Documents when necessary for the bank to respond to "judicial process".

**Reference**   Hernandez Cross-Examination at page 12 (acknowledging
that 15 U.S.C. § 6802(e)(8) permits a bank to produce
non-public personal information of a consumer in response
to "judicial process").

(d)   The restrictions of Florida privacy may be overcome if TD's board of directors
authorizes production.

**Reference**   Hernandez Cross-Examination at pages 38-40, questions
151-159 (acknowledging that Florida law permits banks to
produce banking information if the bank's board of directors
authorizes production).

79.   Finally, if TD is worried that producing the Unredacted Banking Documents would subject
the bank to negative legal consequences, TD has a path available to it that would unquestionably
satisfy its concerns under both the GLBA and Florida privacy law. TD can remove any negative
legal consequences in advance by simply bringing a motion in Florida and seeking an Order that
production is allowed.

**Reference**   Hernandez Affidavit at page 12 (acknowledging that 15
USC § 6802(e)(8) permits the production of a consumer's

non-public personal information to a third party in response to "*judicial process*").

Hernandez Affidavit at page 15 (stating that Fla. St. 655.059(1)(e) permits the production of the bank's books and records "*when compelled by a court of competent jurisdiction*").

### (vi)     *TD Must Produce the Regulatory Investigation Documents*

80.     The third category of documents at issue on this motion – **Regulatory Investigation Documents** – includes documents provided to, and received from, U.S. regulatory authorities in connection with the Rothstein Scheme.

81.     TD's position is that it will not produce documents relating to the OCC or FinCEN investigations. However, TD has not identified the categories of documents it is refusing to produce or provided a list of the documents that it is withholding. At the same time TD generally refuses to seek permission from courts or regulators to produce the documents in this category.

82.     Accordingly, the Insurers are unaware of, and are unable to particularize, the exact documents or types of documents that may be at issue under this category.

83.     For the sake of argument, the Insurers would expect that TD has the following types of Regulatory Investigation Documents:

(a)     reports that TD filed with regulators in the normal course of business, alerting regulators about certain types of transactions in the RRA Accounts (this might include, for example, Currency Transaction Reports or "CTRs" alerting of transactions exceeding $10,000, as well as Suspicious Activity Reports or "SARs" alerting of suspicious transactions),

(b)     correspondence from regulators requesting information about the RRA Accounts or stating conclusions from regulatory investigations (for example, this would

include Reports of Examination or "RoEs" prepared by the OCC in connection with its investigation),

(c) correspondence from TD to regulators answering questions and expressing TD's views on its handling of the Rothstein Scheme,

(d) factual summaries or synopses prepared by TD and provided to regulators in connection with pending investigations, and

(e) copies of business documents kept by TD in the course of its operations and either provided to regulators in the course of their investigation or used to prepare summaries or reports that were then provided to regulators (such as anti-money laundering alerts tripped by transactions in the RRA Accounts).

84. The Regulatory Investigation Documents are relevant. They can be expected to show: what occurred within TD that prompted communication with, or activity by, the regulators (including TD's own business records that were then used for purposes of such communication); what TD informed the regulators of, especially the factual content of such communications; and, what the OCC and FinCEN determined with respect to TD's role in the Rothstein Scheme. Anything elucidating FinCEN's investigation is particularly important, as FinCEN is the primary U.S. government body responsible for overseeing anti-money laundering efforts and the Insurers have relied on the Policies' money laundering exclusion in their Statement of Defence.

85. TD has not identified any Canadian privilege that applies to the Regulatory Investigation Documents. Nor can it – there is none.

86. As these documents are both relevant and non-privileged, TD is obligated to produce them. Nevertheless, TD has refused to either produce, or seek permission to produce, the Regulatory Investigation Documents.

87.     Both Ms. Hernandez and Mr. Peterson agree that there are procedures available in the U.S. to obtain permission to produce certain documents relating to regulatory investigations.[1] Until TD seeks to avail itself of these procedures and makes a concerted effort to obtain permission to produce the Regulatory Investigation Documents, however, it is unclear what U.S. law will or will not permit under the circumstances of this case and therefore what exposure to adverse U.S. consequences TD might create by producing the documents in Ontario. It may well be that a U.S. regulator or court would grant TD permission to release all of the documents TD is concerned about, given that TD would be producing them in litigation under the protection of the deemed undertaking rule.

88.     Ms. Hernandez opines that the Insurers are the "requesters" of information from the OCC because whoever requests permission must explain how the documents would be used and only the Insurers are capable of explaining how they intend to use the documents. Ms. Hernandez's remarks in this regard are of no assistance to this Court, for the following reasons:

(a)     The issue of who is obligated to provide the documents is a matter of Ontario law. Ms. Hernandez is not qualified to opine on Ontario law;

(b)     TD is fully capable of explaining to the OCC why it wants to use the documents: TD will produce them to its insurers to comply with the bank's discovery obligations in a coverage action that TD commenced. The documents will be used by TD and the Insurers to evaluate the facts underlying TD's claims and the Insurers' defences; and

(c)     In any event, if TD requires cooperation from the Insurers to present an effective argument before a regulator or court as to why it should be given permission to

---

[1] The SARs are an exception to this. The Insurers understand from their expert, Mr. Peterson, that there is no procedure by which permission can be sought to release a SAR. Thus it appears clear that U.S. law prohibits TD from producing a SAR. The consequences of this for the Action, and for the Insurers' ability to mount a defence to TD's claims, are a matter for another day.

produce the documents, the Insurers are prepared to provide reasonable assistance to TD to do so.

> **Reference**    Hernandez's Original Report at page 7; Hernandez's Responding Report at page 4.

89.    In sum, TD should be required to seek permission to produce the Regulatory Investigation Documents. If, after this effort, it is clear that TD cannot produce relevant, non-privileged documents in this Action without risking adverse legal consequences to its U.S. operations, and TD cites those grounds for refusing to produce the documents, the parties will be in a position to argue as to what that means for the future of this Action.

90.    That issue may ultimately be similar to that alluded to by Master Albert in *McAvan*, namely, whether, in the absence of production of the documents, TD's should be stayed under s. 106 of the *Courts of Justice Act* or dismissed under rule 30.08. But it is too soon to address that issue which should be left for a later day.

### (vii)    *Conclusion*

91.    Full disclosure of relevant documents is a key component of Canadian civil justice. Our adversarial system, as governed by the Rules, requires that parties be aware of relevant evidence possessed by their opponents and that the Court have this evidence available to it to make a decision. The Ontario Rules require relevant documents to be produced unless they are privileged. Judges have the inherent power to manage litigation to achieve the fundamental principle underlying the Rules: a just, most expeditious and least expensive determination of every civil proceeding on its merits.

> **Reference**    Rules of Civil Procedure, RRO 1990, O.Reg 194, Rule 1.04(1).

> *Abrams v. Abrams*, 2010 ONSC 2703 at para 40 [Insurers'
> Book of Authorities at Tab 15].

92.     In conclusion, TD cannot establish a legitimate basis for withholding the Disputed Documents. The Disputed Documents are a key piece of the underlying litigation as they reveal the truth about the allegations in the underlying litigation and the legitimacy of TD's settlements, and impact the coverage that TD seeks from the Insurers for those settlements. As they are relevant to the issues in this case, and there is no applicable privilege, TD must produce them.

## PART IV - ORDER REQUESTED

93.     The Insurers respectfully request an Order that TD produce the Disputed Documents as defined above. To the extent TD requires additional time in order to take steps to remove the risk of negative legal consequences associated with producing the Disputed Documents, the Insurers do not object to permitting TD a reasonable amount of time to do so.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 31st day of March, 2016.

_____

Gary H. Luftspring

_____

Sam R. Sasso

**RICKETTS HARRIS LLP**
181 University Avenue
Suite 800
Toronto ON  M5H 2X7

Gary H. Luftspring (19972M)
gluftspring@rickettsharris.com
Sam R. Sasso (54124S)
ssasso@rickettsharris.com

Tel:    416.364.6211
Fax:    416.364.1697

Lawyers for the Defendants, Underwriters and
Axis

_____

Jamie Halfnight

_____

Anne Juntunen

**HALFNIGHT & MCKINLAY,**
**PROFESSIONAL CORPORATION**
Barristers and Solicitors
65 Front Street East
Suite 201
Toronto ON  M5E 1B5

Jamieson Halfnight
jhalfnight@halfnightlaw.com
Anne Juntunen
ajuntunen@halfnightlaw.com

Tel:    416.361.3082
Fax:    416.361.0230

Lawyers for the Defendants,
Chubb Insurance Company of Canada and
Liberty Mutual Insurance Company

32

TO:        **MCCARTHY, TÉTRAULT LLP**
Barristers and Solicitors
TD Bank Tower
66 Wellington Street West
Suite 5300
Toronto ON  M5K 1E6

William Scott (23234Q)
Tel:    416.601.8372
Hovsep Afarian (45874O)
Tel:    416.601.7615

Tel:    416.362.1812
Fax:    416.868.0673

Lawyers for the Plaintiff


AND TO:    **AFFLECK GREENE MCMURTRY LLP**
Barristers and Solicitors
365 Bay Street
Suite 200
Toronto ON  M5H 2V1

Peter R. Greene
David Vaillancourt

Tel:    416.360.2800
Fax:    416.360.5960

Lawyers for the Defendants,
Lexington Insurance Company, AIG Insurance Company of Canada (formerly known
as AIG Commercial Insurance Company of Canada) and/or AIG Commercial
Insurance Company of Canada and Chartis Excess Limited (formerly known as AIG
Excess Liability Insurance International Limited) and/or AIG Excess Liability
Insurance International Limited

AND TO:   **DOLDEN WALLACE FOLICK LLP**
          Tenth Floor - 888 Dunsmuir Street
          Vancouver BC  B6C 3K4

          Eric A. Dolden (LSBC #7208)
          Jill M. Shore (LSBC# 501076)
          Gerry J. Gill (LSUC #45952B)
          Tel:    604.891.0350

          Tel:    604.689.3222
          Fax:    604.689.3777

          Lawyers for the Defendant,
          Allied World Assurance Company Ltd.

AND TO:   **MONAGHAN REAIN LUI TAYLOR LLP**
          Barristers
          18 King Street East
          Suite 1205
          Toronto ON  M5C 1C4

          Christopher B. Reain (43157Q)
          Tel:    416.304.9330
          Fax:    416.304.9340

          Lawyers for the Defendant,
          Arch Insurance Company and/or Arch Insurance Canada Inc.

AND TO:   **BLAKENEY, HENNEBERRY, MURPHY & GALLIGAN**
          Barristers and Solicitors
          8 King Street East
          Suite 1501
          Toronto ON  M5C 1B5

          William J. Blakeney (30564L)
          Blakeney@bhmg.ca
          Tel:    416.408.4400
          Fax:    416.408.4900

          Lawyers for the Defendants,
          Endurance Specialty Insurance Ltd., Houston Casualty Company, Markel Bermuda
          Limited (formerly known as Max Bermuda Ltd.), and/or Max Bermuda Ltd. and XL
          Insurance Company PLC (Formerly Known as XL Insurance Company Limited)
          and/or XL Insurance Company Limited

## SCHEDULE "A"

## LIST OF AUTHORITIES

1.      *Frischke v. Royal Bank of Canada*, [1977] 17 O.R. (2d) 388 [*Frischke*] [Insurers' Book of Authorities at Tab 1].

2.      *R. v. Spencer*, [1985] 2 S.C.R. 278 [*Spencer*] [Insurers' Book of Authorities at Tab 2].

3.      *Comexter Inc. v. Cassady* [1987] B.C.J. No. 2625 [*Comexter I*], [Insurers' Book of Authorities at Tab 3].

4.      *Comexter v. Cassady*, [1987] B.C.J. No. 1558 [*Comexter II*] [Insurers' Book of Authorities at Tab 4].

5.      *Ed Miller Sales & Rentals Ltd. v. Caterpillar Tractor Co.*, [1988] 61 Alta. L.R. (2d) 319 [*Ed Miller I*] [Insurers' Book of Authorities at Tab 5].

6.      *Ed Miller Sales and Rentals v. Caterpillar Tractor Co.* (1988), 61 Alta. L.R. (2d) 319 (C.A.) [*Ed Miller II*] [Insurers' Book of Authorities at Tab 6].

7.      *Comaplex Resources International Ltd. v. Schaffhauser Kantonalbank* [1990], 42 C.P.C. (2d) 230 (Ontario S.C.J. (Master)) [*Comaplex I*] [Insurers' Book of Authorities at Tab 7].

8.      *Comaplex Resources International Ltd. v. Schaffhauser Kantonalbank*, [1991] O.J. No. 1643 [*Comaplex II*] [Insurers' Book of Authorities at Tab 8].

9.      *McAvan Holdings v. BDO Dunwoody Ltd.* (2003), 65 O.R. (3d) 247, at paras 7-32, 40 (Ont. S.C.J. (Master)) [*McAvan*] [Insurers' Book of Authorities at Tab 9].

10.     *IPEX Inc. v. AT Plastics Inc.*, 2011 ONSC 4734 (Ont. S.C.J.) [*IPEX*] [Insurers' Book of Authorities at Tab 10].

11.     *Transamerica Life Ins. Co. v. Canada Life Assurance Co.*, 27 O.R. (3d) 291, 46 C.P.C. (3d) 110, at para 25 [*Transamerica*] [Insurers' Book of Authorities at Tab 11].

12.     *Beise v. Bell Helicopter Textron*, 2014 BCSC 1240 (BC S.C.J. (Master)), at para. 23. [*Beise*] [Insurers' Book of Authorities at Tab 12].

13.     *Beazley v. Suzuki Motor*, 2008 BCSC 850 (BC S.C.J.), aff'd 2009 BCCA 57 (BC C.A.) [*Beazley*] [Insurers' Book of Authorities at Tab13].

14.     *Adesa Corp. v. Bob Dickenson Auction Service Ltd.*, [2004] O.J. No. 4925, 73 O.R. (3d) 787, at paras. 53, 56 [*Adesa*] [Insurers' Book of Authorities at Tab 14].

15.     *Abrams v. Abrams*, 2010 ONSC 2703 at para 40 [Insurers' Book of Authorities at Tab 15].

16.     *Whitney Nat. Bank v. Karam*, 306 F. Supp. 2d 678, 682-83 (S.D. Tex. 2004) [Insurers' Book of Authorities at Tab 16].

2

## SCHEDULE "B"

## TEXT OF STATUTES, REGULATIONS & BY - LAWS

Rules of Civil Procedure, RRO 1990, O.Reg 194, Rule 30.02:

## SCOPE OF DOCUMENTARY DISCOVERY

### Disclosure

30.02 (1) Every document relevant to any matter in issue in an action that is or has been in the possession, control or power of a party to the action shall be disclosed as provided in rules 30.03 to 30.10, whether or not privilege is claimed in respect of the document.  R.R.O. 1990, Reg. 194, r. 30.02 (1); O. Reg. 438/08, s. 26.

### Production for Inspection

(2) Every document relevant to any matter in issue in an action that is in the possession, control or power of a party to the action shall be produced for inspection if requested, as provided in rules 30.03 to 30.10, unless privilege is claimed in respect of the document.  R.R.O. 1990, Reg. 194, r. 30.02 (2); O. Reg. 438/08, s. 26.

TD BANK, N.A.
Plaintiff

-and-

"LLOYD'S UNDERWRITERS" et al.
Defendants

Court File No. CV-14-495750

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
PROCEEDING COMMENCED AT
TORONTO

**FACTUM OF THE MOVING PARTIES**
**(MOTION FOR A PRODUCTION ORDER**
**RETURNABLE JUNE 7, 2016)**

**RICKETTS HARRIS LLP**
181 University Avenue, Suite 800
Toronto ON  M5H 2X7

Gary H. Luftspring (19972M)
Sam R. Sasso (54124S)

Tel:   416.364.6211
Fax:   416.364.1697

Lawyers for the Defendants, Underwriters and Axis

**HALFNIGHT & MCKINLAY, PROFESSIONAL**
**CORPORATION**
65 Front Street East, Suite 201
Toronto ON  M5E 1B5

Jamieson Halfnight
Anne Juntunen
Tel:   416.361.3082
Fax:   416.361.0230

Lawyers for the Defendants,
Chubb Insurance Company of Canada and Liberty Mutual Insurance
Company

RCP-E 4C (July 1, 2007)