CITATION: TD Bank, N.A. v. Lloyd's Underwriters, 2016 ONSC 4188
COURT FILE NO.: CV-14-495750
DATE: 20160628

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:** TD BANK, N.A., Plaintiff

**AND:**

LLOYD'S UNDERWRITERS" THAT SUBSCRIBE TO POLICY NUMBER MMF/1710, PRIMARY LONDON REFERENCE NUMBER B0509QA025509 AND EXCESS LONDON REFERENCE NUMBERS QA025609, QA025709, QA025809, AND QA025909, ANTARES UNDERWRITING LIMITED FOR ITSELF AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 1274 (AUL) FOR THE OPERATING YEAR OF 2009, CATLIN SYNDICATE LIMITED FOR ITSELF AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 2003 (SJC) FOR THE OPERATING YEAR OF 2009, NOVAE CORPORATE UNDERWRITING LIMITED AND/OR NOVAE SYNDICATES LIMITED FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 2007 (NVA) FOR THE OPERATING YEAR OF 2009, ACE CAPITAL LIMITED, AVE CAPITAL IV LIMITED, AND ACE CAPITAL V LIMITED FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 2488 (AGM) FOR THE OPERATING YEAR OF 2009, BRIT UW LIMITED FOR ITSELF AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 2987 (BRIT) FOR THE OPERATING YEAR OF 2009, CHAUCER CORPORATE CAPITAL (NO. 3) LIMITED, CHAUCER CORPORATE CAPITAL (NO. 2) LIMITED, AND/OR IRONSHORE CORPORATE CAPUTAL LTD. FOR THEMSELVES AND ON BEHALF OF ALL MEMBERS OF LLOYD'S SYNDICATE 4000 (PEM) FOR THE OPERATING YEAR OF 2009, ASPEN INSURANCE UK LIMITED, GREAT LAKES REINSURANCE (UK) PLC, LEXINGTON INSURANCE COMPANY, AIG INSURANCE COMPANY OF CANADA (FORMERLY KNOWN AS AIG COMMERCIAL INSURANCE COMPANY OF CANADA), AIG COMMERCIAL INSURANCE COMPANY OF CANADA, CHARTIS EXCESS LIMITED (FORMERLY KNOWN AS AIG EXCESS LIABILITY INSURANCE INTERNATIONAL LIMITED), ALLIED WORLD ASSURANCE COMPANY LTD., ARCH INSURANCE COMPANY, AXIS SPECIALTY INSURANCE COMPANY, AXIS SPECIALTY LIMITED, CHUBB INSURANCE COMPANY OF CANADA, HOUSTON CASUALTY COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, MARKEL BERMUDA LIMITED (FORMERLY KNOWN AS MAX BERMUDA LTD.) AND OR MAX BERMUDA LTD., XL INSURANCE COMPANY PLC (FORMERLY KNOWN AS XL INSURANCE COMPANY LIMITED) AND OR XL INSURANCE COMPANY LIMITED and ENDURANCE SPECIALTY INSURANCE LTD., Defendants

- Page 2 -

**BEFORE:**   S. F. Dunphy, J.

**COUNSEL:**   *W. G. Scott, H. Afarian and S. C. D'Souza*, for the Plaintiff

*G. Luftspring and S. Sasso*, for the Defendants Underwriters and Axis

*J. Halfnight and A. Juntunen*, for the Defendant Liberty Mutual Insurance

*P. Green and D. Vaillancourt*, for the Defendant AIG

*C. Reain*, for the Defendant ARCH Insurance

*G. Gill*, for the Defendant Allied World

**HEARD:**   June 7, 2016

## ENDORSEMENT

[1]   This is a motion brought by the defendants seeking to compel the plaintiff to include in its (yet to be delivered) affidavit of documents three categories of documents that the plaintiff claims it cannot produce by reason of various prohibitions existing under United States law. The claim is before me as case management judge and in the context of an insurance claim brought by the plaintiff Toronto-Dominion Bank arising from operations of a subsidiary in the United States.

[2]   For the reasons that follow and in the particular circumstances of this case, I find that the foreign (US) laws in question in fact prohibit the plaintiff from producing and, in some cases, from disclosing even the existence of the documents in question. The plaintiff is subject to and not the beneficiary of the laws in question. It can neither waive the laws nor consent to production of the documents. This court will not lightly require parties to violate foreign laws where these have been found to merit the respect and assistance of this court. It is common ground that avenues exist for the defendants to seek leave or third-party consent for the production of some or all of the documents in question. I am directing the plaintiff to provide reasonable co-operation and assistance in facilitating the identification and production of the documents in question should the defendants chose to seek leave or consent of the relevant authorities and shall request the aid and assistance of the relevant United States court in doing so.

**Factual overview**

[3]   A Florida subsidiary of TD was found to have become implicated in a Ponzi scheme perpetrated on a number of investors in Florida by a name-partner of a now-bankrupt law firm ("Rothstein"). The Rothstein firm was a client of TD's subsidiary. A former employee of that subsidiary (Mr. Spinosa) was alleged to have knowingly aided and assisted Rothstein in the carrying out of the fraud. The TD employee pleaded guilty to some but not all charges made against him as part of a plea bargain. He was given a term in jail. The law firm became

bankrupt and the name-partner who was the mastermind of the scheme has been given an exceptionally long sentence as a guest of a local penal institution to consider whether crime pays.

[4]     The fraud was also the object of investigations by two United States regulators supervising TD's operations – the Office of the Comptroller of the Currency (or "OCC") and the Financial Crimes Enforcement Network (or "FinCEN"). These investigations also resulted in adverse findings against TD.

[5]     While the penal and administrative/regulatory consequences of the scheme were swiftly attended to, the civil aspects took somewhat longer.

[6]     A number of the defrauded investors sued TD and claimed that it was vicariously liable for Mr. Spinosa's role in the scheme. TD notified its fidelity insurers (the defendants in this case) but they declined to undertake TD's defence. The first such civil case to get to trial (*Coquina Investments v. TD Bank et al.*) resulted in a jury verdict in favour of the plaintiff investor which verdict included a substantial award of punitive damages. After an unsuccessful appeal, TD found it more advisable to settle the remaining civil claims rather than run the risk of still further adverse jury verdicts.

[7]     All told, TD spent almost $500 million (including costs) to resolve its potential exposure under the various civil actions brought by the investors. TD commenced this action in 2015 against its insurers under its fidelity policy. The insurers have initially denied coverage also challenge the reasonableness of the settlements reached. TD is claiming the right to recover $300 million of its loss under the relevant policies having regard to claims limits and the applicable deductible.

[8]     This action is still at an early stage. Neither side has produced an affidavit of documents. At my direction, the parties have begun exchanging documents and having their clerks collaborate in formulating an electronic discovery plan to maximize litigation and trial efficiency despite a number of issues pertaining to the finalization of the affidavit of documents that have been identified as requiring resolution. TD has delivered approximately 20,000 documents thus far and there will be many, many more to be delivered regardless of the outcome of this motion.

[9]     In the process of preparing its affidavit of documents, TD advised the defendants that it would not be able to produce the following categories of potentially relevant documents:

    a. "Regulatory Investigation Documents" (documents provided to or received from OCC or FinCEN in connection with their investigation of the Ponzi scheme in question);

    b. "Unredacted Banking Documents" (documents from its client – the now-bankrupt law firm – revealing full transaction details including names and account numbers of third parties transacting with TD's client law firm that are protected by state and Federal privacy laws); and

- Page 4 -

 c. "Protected Documents" (documents marked "confidential" that were produced on discovery by plaintiffs in the settled civil suits against TD that are subject to various Protective Orders issued by the relevant US court).

[10] The defendants accept that TD is in fact prohibited by United States (Federal or state) law or by the Protective Orders from producing documents in these three categories (subject to some minor caveats and nuances). They also accept that there are avenues available either to the defendants or TD to seek consent or leave from the relevant authorities to produce the documents for purposes of this litigation.

[11] The defendants take the position that TD, having chosen to bring this case in Ontario, has the same obligation of all litigants in this jurisdiction to produce an affidavit of documents listing all documents relevant to any matter in issue over which it has power, possession or control, whether or not a privilege is claimed: Rule 30.02(1) of the *Rules of Civil Procedure*. If, as and when TD is able to demonstrate that it has been unable to obtain permission of the relevant court or authority in the US to produce the documents, this court may then consider whether the circumstances then-existing warrant relieving TD of its obligation to produce the documents. It follows, they suggest, that TD should be required to turn over every stone and make every reasonable effort to remove the legal impediments in the United States to the production or identification of these documents and should seek relief from this court only as and when they have been rebuffed.

[12] TD for its part suggests that its production obligations are not nearly as absolute or harsh as suggested. Our courts have a long history of extending comity to courts in the United States. The documents in question came into TD's possession in the course of carrying on business in the United States and while subject to its laws. The impediments to producing the documents under United States law are broadly similar to a number of prohibitions existing under Canadian law. The documents requested are not in the power of TD being in the United States and subject to the legal requirements of that jurisdiction. The defendants have avenues available to them if they seek production and TD has offered to extend reasonable co-operation to assist them in obtaining consent or leave as the case may be. There is no evidence that TD is in a better position than the defendants nor, given the means of the parties and the stakes of this litigation, is cost of the process a real objection. TD objects to the suggestion that it must make applications itself for documents sought by the defendants while a sword of Damocles is suspended over its head suggesting that if its efforts are not judged satisfactory by the defendants it might be held to account and run the risk of sanctions in Ontario simply for obeying US laws that the insurers knew or ought to have known it was subject to when insuring those same US operations of TD.

[13] For the reasons that follow, I have decided to cut the Gordian knot and adopt a simple but pragmatic approach. It matters little whether TD is excused from producing the documents because they are deemed not in TD's power or control by reason of US law affecting them or whether by reason of those same laws and the application of principles of comity TD should be excused from producing them. The outcome is the same. I can see no cause to harness TD to the wheel and compel them to perform feats before US regulators or courts under vague threat of future sanctions if its performance is not judged by the defendants to have been adequate in

- Page 5 -

hindsight. There is no evidence TD is better situate to obtain production of the documents free of US law than the defendants who actually seek the documents and desire their production.

[14]   I have fashioned an order designed to permit the defendants to obtain what they seek, but requiring them to take the initiative of doing so (with some narrow exceptions).

### Issues to be decided

[15]   This motion raises the question of what recognition ought this court to extend to prohibitions against the production of the admittedly relevant documents under foreign law.

### Analysis and discussion

[16]   The defendants were by and large willing to concede that the legal impediments under US law raised by TD were serious and real and the consequences of ignoring them would be quite serious as well. Their own expert evidence suggested some possible exceptions might be available here or there, but accepted that in the main, the pleaded legal impediments were both serious and real. While arising under foreign law, they are of a quite familiar sort since our own jurisdiction imposes largely similar restrictions in similar circumstances.

[17]   In light of this, the defendants were required to concede that there is vanishingly little chance that I could be persuaded to order TD to breach US law that it is quite ordinarily and validly subject to. Comity is a value that runs deep on both sides of our border and is the product of a very long, peaceful and cooperative history and common legal culture. The US is by no means the only jurisdiction to whom we ordinarily extend comity, but it can perhaps be considered to occupy a pre-eminent ranking in the list.

[18]   Our courts have always sought means of accommodating the reasonable requirements of foreign law in matters pertaining to the production of documents in litigation. They do so whether by way of recognizing statutory privileges under foreign law or by way of extending comity. I am persuaded by the sentiments expressed by Brooke J.A. in *Frischke et al. v. Royal Bank of Canada et al.*, (1977) 17 O.R. (2d) 388 where he found (at para. 26):

> "An Ontario Court would not order a person here to break our laws; we should not make an order that would require someone to compel another person in that person's jurisdiction to break the laws of that State. We respect those laws. The principle is well recognized."

[19]   This case is not at all similar to the situation faced by Master Albert in *McAvan Holdings v. BDO Dunwoody Ltd.*, 2003 CanLII 64222 (ON SC) where the defendant's consent to the production of the documents was all that was wanted to gain access to the documents protected by law (in this instance, Canadian law) from production. It is common ground in the present case that TD cannot consent to the production of these documents. Either the consent of the relevant regulator, third party or court is required and TD has no power to compel such consent or leave to be provided. TD has only the power to ask – something the defendants are equally well situated to do.

- Page 6 -

[20]   For reasons that I have yet to fathom, the real dispute between the parties appeared to come down to who, as between the plaintiff and the defendants, should actually make the relevant applications to determine whether the legal prohibitions under US law can be lifted or relaxed. If the foreign law prohibition is bona fide and of a sort that ought to attract comity from this court, this court ought not to hold a plaintiff who is subject to that valid prohibition as a sort of hostage bound to seek waivers of that law in the absence of compelling evidence that the plaintiff has some material advantage in seeking the documents compared to the defendants. If the prohibition is deserving of comity, comity should be extended without adding a price tag to be paid by the plaintiff who is merely caught in the middle of a legal conflict it did not create.

[21]   I shall turn now to a consideration of each of the three categories of documents and my more detailed disposition of each.

   (a)   Regulatory Investigation Documents

[22]   In connection with reporting to its regulators and assisting in their investigations of the Rothstein Ponzi scheme, TD sent documents to and received documents from both OCC and FinCEN.

[23]   TD's expert, Ms. Hernandez, provided a report describing the sources and extent of the privileges attached to communications with these two regulators.

[24]   In relation to the OCC, Ms. Hernandez' option provides:

> "There is a specific and strict communication privilege that exists between banks and their respective federal banking regulator, such as the OCC, TD Bank's primary federal regulator. This communication privilege, known as the "supervisory privilege" prohibits the disclosure of regulatory documents, including Reports of Examination, correspondence with regulators and other non-public supervisory information regarding a financial institution".

[25]   FinCEN receives "Suspicious Activity Reports" from regulated financial institutions including TD. FinCEN considers the SAR's themselves *and even the fact that a SAR was filed* to be confidential information that may not be publicly disclosed. Unauthorized disclosure of a SAR or any information concerning a SAR is punishable by civil and criminal penalties.

[26]   At least some of the friction between the parties and their respective experts on this issue appeared to me to be the result of miscommunication. The defendants feared that TD was claiming that documents that were not otherwise privileged from production in this litigation somehow *acquired* privilege solely by virtue of having also been produced to OCC or FinCEN. That fear appeared to me to be entirely misplaced and TD readily agreed. Documents created or recorded for some other purpose but that were also provided to OCC or FinCEN are producible (although the actual communication of those documents to the regulators is not). While there may well be minor disputes around the margins, the well-known "dominant purpose" test would appear to me to be a very serviceable litmus test for determining whether a document was created for the purpose of being given to the regulators or for some other purpose and then

[26 cont.] subsequently disclosed to the regulators. If the dominant purpose underlying the creation of a particular document was to report to the regulators, its production ought to be conditioned by that dominant purpose.

[27]   Both expert reports concur that routes exist for either TD or the defendants to seek consent of these regulators to the production of some or all of the information that TD is otherwise prohibited from disclosing.

[28]   The regulatory privilege claimed in this case is neither of a type nor breadth that is unknown in our domestic law. The *Securities Act*, RSO 1990, s. S.5 s. 13, the Regulations under the *Insurance Companies Act*, SC 1991, c 47, the *Office of the Superintendent of Financial Institutions Act*, RSC 1985, c 18, s. 39.1 all may be referred to for similar restrictions.

[29]   The details of these and other statutes are of course not identical, but their essential goals are similar. Fostering the necessary degree of open dialogue between regulated institutions and regulators is to be protected and encouraged by the creation of broad zones of confidentiality. The privilege is not absolute and grounds may exist in certain cases to disregard it. However, it would seem clear that the jurisdiction that has created the privilege and foreseen a mechanism to seek departures from it is better situate to judge when and in what circumstances the policy in favour of confidentiality ought to cede to the policy in favour of affording litigants full access to documents needed to establish their case or rebut the case made against them.

[30]   There is nothing in the evidence before me to suggest that TD has any kind of advantage in seeking consent to the production of this category of documents for the purposes of this litigation. The claimed privilege is one that satisfies the Wigmore test for assessing communications worthy of protection applied by the Supreme Court of Canada in *Slavutych v. Baker et al.*, [1976] 1 SCR 254, 1975 CanLII 5 (SCC). The communications originated in confidence, the maintenance of that confidence is necessary, the relation is one that ought to be fostered having regard to our own similar mosaic of laws and the injury that would ensue from disclosure outweighs the benefit. In the case of the latter criteria, there is no reason to expect the privileged regulatory exchanges would communicate *facts* not able to be obtained from other sources. Admissions made in confidence to regulators may prove beyond reach, but the facts needed to justify them can be obtained by other means.

[31]   In my view, the regulatory privileges created under the relevant US laws in favour of communications with OCC and FinCEN ought to be recognized and afforded comity in the circumstances of this case and the avenues for obtaining exceptions to or waivers of the privilege available under those same laws are best situate to weigh the competing interests.

[32]   I can see no basis to require TD to bear the initiative of bringing applications to seek consent for production before these regulators, particularly where I have no reason to assume TD's application will be successful or more successful than an application brought by the defendants. I am not prepared to order production of this category of documents. I reserve the right to require TD to provide reasonable assistance to the defendants in processing any applications they may be minded to bring and in that connection the defendants ought to be entitled to proceed with the benefit of a request from this court for aid and assistance if need be.

(b)  Unredacted Banking Documents

[33]  TD's Florida banking subsidiary is subject to both Federal and State law that protect the privacy of certain banking documents. As argument progressed, the gaps between the positions of the parties appeared to narrow.

[34]  TD's customer in this case was a law firm that is now bankrupt. The account information of the Rothstein firm – including transaction records - has already been made public in a redacted format as part of the bankruptcy proceedings. TD does not object to producing the redacted account information of its own customer since this is already public. What the defendants are seeking is the *unredacted* version of those public documents that will reveal the identity and account numbers of *all* parties transferring funds into the law firm's accounts and the identity of parties receiving funds transferred out. Funds electronically transferred in or out of the accounts would generate an electronic trail indicating the name of the sending or receiving financial institution, the name of the account holder and the holder's own account information. All of this data is subject to privacy laws not unlike our own.

[35]  The defendants are unable at this point offer more than speculation as to what relevance much of this information will have. Some of the information will be duplicative of the next category of documents (documents produced by the defrauded investors in support of their now-settled claims against TD). Other transactions will reflect ordinary course transactions of parties dealing with the law firm that is quite unrelated to the fraud. The defendants claim they are handicapped by not knowing what they don't know. Without more, they will be unable to undertake any kind of forensic analysis of the accounts although precisely what forensic analysis they intend to undertake and to what purpose is not yet clear.

[36]  The expert evidence of both sides concurred that the relevant Federal regulation is the *"Gramm-Leach-Bliley Act"* and *"Regulation P"* that prohibits a financial institution from disclosing a consumer's non-public personal information to a non-affiliated third party except in limited circumstances. While the defendants suggest that few of the transactions in the law firm account at TD will involve "consumers" as defined in the *Gramm-Leach-Bliley Act*, TD counters that this cannot be determined in advance. The consequences of breach of the statute are potentially grave.

[37]  Florida law also protects the privacy of banking information and, unlike its Federal counterpart, is not restricted to consumers. Florida's *Privacy Law* (Fla. Stat. Section 655.059) restricts the disclosure of a financial institutions books and records including customer information and imposes criminal sanctions for violations of it. It is not clear under Florida law whether an Ontario court would be considered a "court of competent jurisdiction" that could compel production notwithstanding the *Privacy Law*.

[38]  I am satisfied based upon the expert evidence provided to me that these two statutes prohibit TD from producing the Unredacted Banking Documents without running a serious risk of criminal sanctions.

- Page 9 -

[39] The defendants' expert suggested that there may be arguments available to TD to support the possible grounds for producing some of the Unredacted Banking Documents. An Ontario court order *might* provide justification under US law. Or it might not. It cannot yet be said how a Florida court would consider the matter.

[40] In my view, this is a case where the privacy interests protected by Florida and US law ought to be accommodated as far as reasonably practicable. The following factors, among others, appear to me to be influential ones:

> a. The fact that the policy of the two foreign laws in question is analogous to similar policies finding expression in our own law[1] even if the expression of that policy is not in all respects identical;
>
> b. The fact that Florida and the United States have the closest and most real connection with the creation and custody of the documents and the privacy interests being protected belong to parties who are largely if not exclusively resident there as well; and
>
> c. The fact that the insurance policy that is the subject-matter of this action was issued by insurers who voluntarily chose to extend coverage to the operations of an insured in the jurisdiction where the documents they now seek were created and stored.

[41] The penalty for violating either statute is potentially very severe and the risk is by no means imagined or fanciful. This court is not in the habit of ordering litigants to breach foreign law. Whether I conclude that the documents are beyond the power or TD to produce by reason of the legal impediments or whether I exercise my discretion to grant comity to the foreign rules and relieve TD from its obligations to list and produce these documents would appear to me to be a distinction without a difference.

[42] In my view, the preferred course of action in this case is (i) to recognize that TD is prohibited by Florida and US law from producing the redacted information from the transaction records of its customer; (iii) to recognize that such privacy laws are entitled to comity from this court; and (iii) to grant the defendants an order seeking the aid and assistance of the courts of the United States to secure the production of the unredacted information. Such an order *may* take the form of an order directed to TD to produce the information provided that the order is conditional upon such order being recognized by a court of competent jurisdiction in the United States which the defendants shall be at liberty to seek. I leave it to the parties to seek advice from the experts as to how best to formulate the request.

[43] I find that the privacy interests of parties engaging in what may well be entirely unrelated transactions with TD's Florida customer is an interest deserving to be recognized and

---

[1] See for example *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5.

fostered having regard to the Wigmore criteria. TD is justified in not violating US law to produce the documents of such uncertain value in Canada. A US court will be better situate than this court to weigh the potential harm of disclosure against the as-yet uncertain benefits to the litigation process of production. The confidentiality of the documents in these circumstances ought to be respected subject to the discretion of the relevant US court to consent to their production. I can see no reason in such a case to hold TD hostage to obtain the consent of US courts over which it has no control. The initiative to seek consent to the production of the documents ought to be borne by the defendants seeking them.

[44] I leave it to the parties to work out the form of order and request best suited to facilitate the defendant's application to gain access to the redacted information after seeking appropriate US legal advice including restrictions, if any, on the use of the documents in Canada.

### c. Protected Documents

[45] The deemed undertaking rule that protects documents produced in the course of discovery from being used for other purposes is contained in Rule 30.1 of the *Rules of Civil Procedure*. In many jurisdictions in the United States, a similar result is obtained, but following a process of crafting disclosure orders on a case-by-case basis. While the orders are customized somewhat, they follow a broadly similar template.

[46] In general terms, where the producing party has designated a particular document or class of document as "confidential", the Protective Orders under which TD obtained possession of these documents offers only two routes by which the documents may be produced: (i) TD may seek the consent of the producing party or (ii) the court issuing the Protective Order may amend or vary its order to permit production.

[47] I can see little reason to treat Protected Documents any differently from the Unredacted Banking Documents or the Regulatory Investigation Documents. If this court will be slow to require TD to violate applicable Federal and State banking laws in order to accommodate the discovery requests of the defendants in the circumstances of this case, it will not be any swifter in requiring TD to breach the Protective Orders.

[48] In a perfect world, TD would have destroyed these documents soon after the litigation that caused them to be produced was settled. They were not. TD is, in effect, the accidental custodian of documents belonging to litigants who produced them under compulsion (and subject to the protection) of the Protective Orders and legal process.

[49] I am persuaded by the reasoning of Masuhara J., in the case of *Bryar Law Corporation v. Samsung Electronics Co. Ltd.*, 2010 BCSC 1661 (CanLII) where he expressed what was in my view appropriate reluctance to "grant discovery in contravention of a Protective Order from the California court. As a matter of respect, courts should refrain from interfering with the orders of courts in other jurisdictions" (at para. 47).

[50] The case of *Vitapharm Canada Ltd. v. F. Hoffman-LaRoche Ltd.*, 2001 CanLII 28239 (ON SC); affirmed sub nom. *Ford v. Hoffmann-La Roche Ltd.*, 2003 CanLII 30349 (ON CA) is

- Page 11 -

also instructive. In *Vitapharm*, it was the plaintiffs who were seeking to obtain access to discovery documents produced in US litigation from the defendants. The plaintiffs had brought motions to vary the US Protective Orders before the judge who had made them. The moving party defendants sought an order from the Ontario court restraining the plaintiffs from seeking those documents in the United States. The case was thus, to an extent, the mirror of this one. Cumming J. declined to interfere with the efforts of the plaintiffs in the US and his order was affirmed by the Court of Appeal.

[51]   In my view, the Protective Orders are entitled to comity from this court. The defendants are free to follow the example of the plaintiffs in *Vitapharm* and apply to obtain production in the manner prescribed by the Protective Orders. It is my understanding that the defendants have copies of the relevant Protective Orders. These should be produced if they do not.

[52]   If and to the extent an order of this court or the co-operation of the plaintiff becomes necessary or desirable to pursue an application for production of the documents through the relevant United States court, the defendants may apply for an order on evidence of what is required and why.

[53]   While I would generally be of the view that the initiative ought to be taken by the defendants seeking access to documents belonging to third parties covered by the Protective Orders, it seems to me to be reasonable to require TD to request the consent of the relevant US litigants before requiring the defendants to bring application in the United States. Such a comparatively simple step may well bear fruit. Some or all of the litigants in the US may prefer to negotiate terms under which the documents are produced or they may be satisfied with the provisions of our deemed undertaking pursuant to Rule 30.1 of the *Rules of Civil Procedure* once informed of it. I cannot assume they will be obdurate for the sake of it nor can I presume to know what reasonable objections they may have.

[54]   Accordingly, I direct:

> i. The plaintiff shall provide copies of all relevant Protective Orders to the defendants;
>
> ii. The plaintiff shall send a letter (in form reasonably satisfactory to the defendants) requesting litigants whose documents they possess through one or more Protective Orders requesting their consent to the production of such documents to the defendants in this litigation; and
>
> iii. The defendants shall be authorized to bring such motions to vary the Protective Orders before the courts that issued them to obtain production of the Protected Documents as they wish.

## Disposition

[55]   Given the customized nature of my order in respect of each separate category of documents, this is one case where it seems most appropriate to provide "Order Accordingly" and

leave the parties some space to work out the precise terms of one or more orders best suited to accomplish the objectives expressed in these reasons.

[56]   While TD has been largely successful on this motion, I am of the view that it is most appropriate to award costs in the cause in this instance. This is a large and complex case. There will doubtless be a number of issues arising that the parties will need assistance on. To their credit, they have shown a fairly high level of civility and cooperation in developing this case thus far. I am disinclined in a case such as this to issue a number of what could only be (in the scale of this case at least) nuisance costs awards that will simply create distractions and minor annoyance where motions have been reasonably brought and conducted. Such awards will neither incent better behaviour from the parties than I am able to monitor and secure as case management judge nor would they materially advance the principle of indemnity. If either side is of the view that a particular motion is deserving of different treatment as regards costs, they are of course invited to signal that position to me in their written or oral argument.

_____
S.F. Dunphy, J.

**Date:** June 28, 2016